IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **PHARMASTEM THERAPEUTICS, INC.,** ) | |
| ) | |
| Plaintiffs, ) | |
| ) | Civil Action No. 2:04-CV-03561-RK |
| v. ) | |
| ) | |
| **CORCELL, INC., MOLLY McBRIDE, M.D.** ) | |
| **and CARLO M. CROCE, M.D.** ) | |
| ) | |
| Defendants. ) | |
| ) | |
| **CORCELL, INC.,** ) | |
| ) | |
| Counterclaim-Plaintiff ) | |
| ) | |
| v. ) | |
| ) | |
| **PHARMASTEM THERAPEUTICS, INC.,** ) | |
| **NICHOLAS DIDIER and STEMBANC, INC.,** ) | |
| ) | |
| Counterclaim-Defendants. ) | |

## ORDER

AND NOW, this ___ day of _____, 2004, upon consideration of Nicholas Didier's Motion to Dismiss and CorCell, Inc.'s Opposition thereto, it is hereby ORDERED and DECREED that Nicholas Didier's Motion is DENIED.

BY THE COURT:

_____
J.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| PHARMASTEM THERAPEUTICS, INC., | ) |
| Plaintiffs, | ) ) ) |
| | ) Civil Action No. 2:04-CV-03561-RK |
| v. | ) ) |
| CORCELL, INC., MOLLY McBRIDE, M.D. and CARLO M. CROCE, M.D. | ) ) ) |
| Defendants. | ) ) |
| CORCELL, INC., | ) ) |
| Counterclaim-Plaintiff | ) ) |
| v. | ) ) |
| PHARMASTEM THERAPEUTICS, INC., NICHOLAS DIDIER and STEMBANC, INC., | ) ) ) |
| Counterclaim-Defendants. | ) |

**DEFENDANT/COUNTERCLAIM PLAINTIFF CORCELL'S
MEMORANDUM OF LAW IN OPPOSITION TO COUNTERCLAIM
DEFENDANT NICHOLAS DIDIER'S MOTION TO DISMISS**

INTRODUCTION

Defendant/Counterclaim Plaintiff CorCell, Inc. ("CorCell") respectfully requests this Court to deny Counterclaim Defendant Nicholas Didier's ("Didier's") Motion to Dismiss CorCell's Counterclaims. This Court has *in personam* jurisdiction over Didier and each one of CorCell's Counterclaims are fully supported by the pleadings, sufficiently putting Didier on notice of the claims against him and the material facts supporting those claims.

Didier has improperly applied the law regarding *in personam* jurisdiction and therefore, has not shown that this Court does not have personal jurisdiction over him. Also, Didier'

563240_1

argument applies the wrong standard. The issue is not CorCell will prevail after trial, but whether CorCell has stated a claim upon which relief has been granted. It has, and Didier's motion must be denied.

## STATEMENT OF FACTS

Plaintiff/Counterclaim Defendant PharmaStem Therapeutics, Inc. ("PharmaStem") is the assignee/owner of U.S. Patents 5,004,681 ("the '681 Patent"), 5,192,553 ("the '553 Patent"), 6,461,645 ("the '645 Patent"), 6,569,427 ("the '427 Patent") and 6,605,275 ("the '275 Patent"). *See* Answer of Defendants To Plaintiff's Complaint and Counterclaim of Corcell, Inc., ¶ 8 (hereinafter "CorCell Counterclaim"). On February 2002, PharmaStem filed suit in the United States District Court for the District of Delaware against CorCell and several other companies, alleging infringement of the '681 and '553 patents. ("the Delaware Action"). *Id.* ¶ 9.

After a jury trial in the Delaware Action, a verdict was entered in favor of PharmaStem and against CorCell and the other companies, finding the patents valid and infringed, and awarding damages to PharmaStem. *Id.* at ¶ 10. Post trial motions were timely filed, including a motion by PharmaStem for entry of a permanent injunction and motions by CorCell and the other defendants for judgment as a matter of law or for a new trial. *Id.* at ¶ 11. On September 15, 2004, a Memorandum Opinion was issued in the Delaware Action finding in favor of CorCell and the other defendants on the claim of infringement of the '553 Patent, and granting their motion for a new trial on the issue of infringement and damages with respect to the '681 Patent.

Starting June 1, 2004, Nicholas Didier, on behalf of PharmaStem sent to approximately 25,000 obstetricians and hospitals letters (thousands of which were directed into Pennsylvania) containing false and misleading statements including, but not limited to, the following:

> Patent infringement occurs when a person or institution practices all or part of a patented process. In the case of umbilical cord blood collection by an

> obstetrician, the Court ruled that infringement occurs even if the cryopreservation and storage is performed by a third party.

*See Id.* at ¶ 12. The Honorable Gregory M. Sleet of the District of Delaware issued an Order for Injunctive Relief on July 2, 2004 in response to a motion filed by CorCell and the other defendants in the Delaware Action, finding that "PharmaStem's June 1, 2004 letter to Obstetricians ("the PharmaStem Letter") contains false and misleading statements concerning the Court's rulings to date." *Id.* at ¶ 13. Judge Sleet, who presided over the Delaware Action, in particular found, in pertinent part, that:

> 1. PharmaStem's June 1, 2004 letter to Obstetricians (the "PharmaStem Letter") contains false and misleading statements concerning this Court's rulings to date. In particular, the Court finds the following statements in this PharmaStem Letter false and misleading:
>
> A. "Patent infringement occurs when a person or institute practices all or part of a patented process." The Court finds this statement is misleading because it is black letter law that in order to prove contributory infringement of a method patent, the <u>entire</u> patented process must be performed. By suggesting that infringement would occur when only part of a process in performed, the letter is misleading.
>
> B. "In the case of umbilical cord blood collection by an obstetrician, the Court ruled that infringement occurs even if the cryopreservation and storage is performed by a third party." The Court finds this statement misleading for at least the following reasons. <u>First</u>, the sentence states that "the Court ruled" with respect to the "case" of "umbilical cord blood collection by an Obstetrician." This Court never made any rulings regarding conduct by obstetricians. There were no such allegations advanced in the trial of this matter. <u>Second</u>, the sentence leaves out several important elements that must be proved to show contributory infringement. The missing elements include:
>
>> (1) that there must be a <u>sale</u> or <u>offer to sell</u> by the party that is accused of contributory infringement,
>>
>> (2) that the party accused of contributory infringement must be "acting in concert or working together" with the other parties whose combined conduct performed each and every element of the patented process, and

> (3) that, under §271(c), a sale of a service, as opposed to a sale of a tangible physical object, is not sufficient to satisfy the requirements of the contributory infringement statute.

The Court finds that without these elements, the statement is misleading. Judge Sleet granted an injunction against further false or misleading communications directed to obstetricians. The injunction was granted, in part, because the Didier June letter made no mention of the sale or offer to sell requirement, the "acting in concert or working together" requirement, or that the sale of a service cannot satisfy §271(c) of the Patent Act. *Id.*

In spite of Judge Sleet's order, PharamStem, after filing this infringement action against CorCell and Drs. Molly McBride and Carlo Croce, disseminated a press release (the "Press Release") that contained similar false and misleading statements to those found to be false and misleading by Judge Sleet. Once again, PharmaStem caused copies of the press release to be mailed to thousands of obstetricians. *Id.* at ¶14.

In fact, in July and August, 2004, PharmaStem filed five separate suits, including this action, in which PharmaStem sued a private cord blood bank and one or more health care providers, i.e., individual physicians (as in this case), group medical practices or a hospital. *Id.* at ¶ 15. In each of these cases, PharmaStem made a boilerplate allegation of infringement of the '427 patent against both the defendant private cord blood bank and at least one health care provider. *Id.* at ¶ 16. Shortly after initiating suit in the Central District of California against CureSource, Inc., and twelve physicians, Didier sent a letter to the defendant physicians, offering to "settle" with them by agreeing not to enforce any of PharmaStem's five patents against them if the doctors would agree not to collect cord blood or provide any service for or "in connection with" any of the private cord blood banks not licensed by PharmaStem, and further agree not to

market or offer any service of the defendant cord blood banking companies. *Id.* at ¶ 17; *See also Id.*, Exhibit D.

On August 20, 2004, PharmaStem sent another letter and an amnesty agreement to obstetricians (the "Amnesty Agreement") that contained similar false and misleading statements. PharmaStem insisted that the obstetricians sign the Amnesty Agreement to avoid legal action by PharmaStem, and that the obstetrician only work with PharmaStem's licensees. In disregard of the findings and final orders of the Delaware District Court, the letter of August 20, 2004, states the following: "It is PharmaStem's position, as asserted in the recent lawsuits, that obstetricians are liable for patent infringement if they collect cord blood or market services for unlicensed cord blood banks." *Id.* at ¶ 18. The Press Release and the letter of August 20, 2004 failed to correct the earlier misrepresentations, failed to disclose the inaccuracy of the earlier misrepresentations, and failed to disclose the rulings of the Delaware District Court. *Id.* at ¶ 19. Indeed, Didier conceded in testimony before Judge Sleet on November 3, 2004, that he was aware at least by July 2, 2004 that Judge Sleet had ruled that a statement that performing only part of a patented process was infringement would be false and misleading. See Transcript of Hearing, November 3, 2004, at 27, attached hereto as Exhibit A. He further admitted that he nevertheless represented to physicians in the August 20 letter that performing just part of the patented process, collecting cord blood, was enough for infringement. *Id.* at 43-44.

Didier and PharmaStem have issued these statements in bad faith, for the clear purpose of damaging CorCell's business and creating false implications with the consuming public and obstetricians. *Id.* at ¶ 22. Even after Judge Sleet's decision, PharmaStem and Didier have continued to issue false and misleading statements. In particular, on September 20, 2004, Didier caused PharmaStem to issue a press release which mischaracterizes the Court's ruling as well as

563240_1                                                5

defendants' positions in the case, e.g., PharmaStem states that the Court "agreed with the defendants" that families who bank with the defendants could be liable for infringement; in fact, the basis for the Court's decision was that the defendants did not sell or offer to sell cord blood. Defendants did not argue that families are liable for infringing PharmaStem's patents; parents do not sell or offer to sell cord blood, and therefore cannot be liable. This is but the latest false implication designed to deter patients from seeking medical services without regard to the narrow limitations of PharmaStem's patents. *Id.* at ¶ 24.

As a result of the actions of Counterclaim-defendants, some physicians have declined to collect cord blood for customers of CorCell and have ceased to recommend CorCell's services. Customers of CorCell have been prevented from fulfilling their contracts with CorCell, and others have been dissuaded from contracting with CorCell at all, because of the actions of Counterclaim-defendants. Of course, such a response was exactly what PharmaStem and Didier wanted to achieve. *Id.* at ¶ 26.

The foregoing facts are more than sufficient to support CorCell's counterclaims against Didier.

**ARGUMENT**

A. **CorCell has Plead Facts Upon Which The Court May Exercise In Personam Jurisdiction Over Didier**

CorCell has sufficiently plead facts on which the Court can exercise *in personam* jurisdiction over Didier. This Court must assess three factors to determine whether asserting jurisdiction over Didier comports with due process. "The three factors are: (1) whether the defendant purposefully directed its activities at residents of the forum; (2) whether the claim arises out of or relates to the defendant's activities with the forum; and (3) whether assertion of

personal jurisdiction is reasonable and fair. *Inamed Corporation v. Kuzmak*, 249 F.3d 1356, 1360 (Fed. Cir. 2001). In this case, Didier's activities meet all three factors.

### 1. Didier Purposefully Directed His Activities At Residents Of This Forum

As CorCell set forth above, Didier has sent numerous letters to obstetricians and healthcare providers throughout the United States threatening them with baseless actions for patent infringement. Specifically, thousands of those letters, including one addressed to Dr. Molly McBride, a defendant in this case, were directed to addresses in Pennsylvania. Didier later sent another letter to the same physician list. In that letter, Didier agreed not to enforce any of PharmaStem's five patents against them if the doctors would agree not to collect cord blood or provide any service for or in connection with any of the private cord blood banks not licensed by PharmaStem, and further agree not to market or offer any service of those cord blood bank companies. This letter, specifically set forth CorCell as one of the private cord blood banks not licensed by PharmaStem. Unfortunately for CorCell, Didier's attempts have been, and are continuing to be, successful. It cannot be argued that Didier has not purposefully availed himself of this jurisdiction in spearheading PharmaStem's attempts to eliminate CorCell's ability to operate its business in Pennsylvania by sending baseless infringement threats to doctors and healthcare providers in this state and attempting to intimidate them to cease providing a medical service for CorCell's customers. Didier's activities in this jurisdiction go beyond the sending of letters to Obstetricians advising them of PharmaStem's patents. Didier's conduct is more than sufficient to meet the minimum contacts requirement. *See Inamed*, 249 F.3d at 1361 (finding that "the combination of [Defendants] infringement letter and his negotiation efforts which

culminated in four license agreements with [Plaintiff] is sufficient to satisfy the first factor").[1]
*See also Suprex Corporation v. Lee Scientific, Inc.,* 660 F. Supp. 89, 92 (W.D. Pa. 1987) (finding that defendant negotiated and entered into a license agreement with Mobay and the fact that the causes of action alleged by plaintiff (...unfair competition, tortious interference with contractual relations) arise from [defendants'] attempts to dissuade Mobay from conducting business with [plaintiff] was sufficient to subject defendant to personal jurisdiction in Pennsylvania).

    2.    **CorCell's Counterclaims Arise Out of Didier's Activities**

Didier does not, and cannot, argue that the activities conducted by Didier in this jurisdiction are not the cause of the Counterclaims brought by CorCell. *See Id.*

    3.    **This Court's Exercise of Personal Jurisdiction Over Didier is Reasonable and Fair**

The exercise of personal jurisdiction over Didier comports with standards of fairness.

> In addressing the reasonableness of exercising jurisdiction, the Supreme Court has stated that the inquiry would depend on an evaluation of several factors: (1) the burden on the defendant, (2) the interests of the forum state, (3) the plaintiff's interest in obtaining relief, (4) the interstate judicial systems interest in obtaining the most efficient resolution of controversies, (5) the shared interest of the several states in furthering fundamental substantive social policies.

*Inamed,* 249 F.3d. at 1363. In the present case, Pennsylvania has a substantial interest in providing its residents with a convenient forum for addressing injuries inflicted by Didier in attempting to deter doctors and medical care providers from providing services to CorCell's customers. PharmaStem has brought its infringement claims in this Court and CorCell's Counterclaims are directly related to Didier's activities with respect to threats of action for

---

[1] Didier himself has personally participated in negotiations in Pennsylvania that led to at least one license agreement covering the patents at issue.

infringement of those patents. CorCell has an obvious interest in being able to obtain relief in such a convenient forum. *Id.* Didier does not, and cannot argue that the exercise of jurisdiction by this Court would be unreasonable.

The cases cited to support Didier's argument that infringement letters alone are not enough to establish personal jurisdiction are inapposite to the present cases. Each of the cases cited by Didier involve the courts' exercise of *in personam* jurisdiction over a defendant in a declaratory judgment action, wherein plaintiff's basis for the court's jurisdiction is defendant's sending of infringement letters to plaintiff. *See Red Wing Shoe Co. v. Hockerson-Halberstadt, Inc.*, 148 F.3d 1355, 1361 (Fed. Cir. 1998); *Genetic Implant Sys., Inc. v. Core-Vent Corp.*, 123 F.3d 1455, 1458 (Fed. Cir. 1997); and *Dainippon Screen Mfg. Co. v. CFMT, Inc.*, 142 F.3d 1266, 1269 (Fed. Cir. 1998). This is not a simple declaratory judgment case seeking a determination of non-infringement resulting from Didier's sending of letters announcing PharmaStem's patents. In this case, this Court's jurisdiction over Didier is based on the purposefulness of his activity in making baseless threats that constitute misuse of PharmaStem's patents and which could reasonably be foreseen to have effects in Pennsylvania which would subject him personally to suit within Pennsylvania for the damages caused by his activity. *See Ruger v. Superior Court*, 118 Cal.App.3d 427, 434 (Cal. Ct. App. 1981) (cited by Didier).

Accordingly, this Court's assertion of jurisdiction over Didier comports with due process.

### B.  CorCell's Counterclaims Are Ripe For Consideration By This Court

Didier argues that there is no ripe controversy concerning his conduct in making threats of infringement because the Court has not yet adjudicated PharmaStem's claims of infringement. This position is patently wrong. If it were otherwise, the victim of a pattern of threats of baseless

patent litigation could never bring an action to protect its interests until it had fully litigated any claim of infringement.

"To satisfy Article III's case or controversy requirement, an action must present (1) a legal controversy that is real and not hypothetical, (2) a legal controversy that affects an individual in a concrete manner so as to provide the factual predicate for reasoned adjudication, and (3) a legal controversy so as to sharpen the issues for judicial resolution." *Armstrong World Industries, Inc. v. Adams*, 961 F.2d 405, 410 (3rd Cir. 1992). In the present case, CorCell's counterclaims meet Article III's requirements.

The sufficiency of CorCell's injuries as a result of Counterclaim Defendants' action is clear and uncontroverted by Didier. CorCell has lost, and continues to lose, business from current and potential customers due to the false and misleading statements made by Didier in letters sent to obstetricians, and published on websites relating to its patents.

Whether or not the Court ultimately finds that CorCell or the Defendant physicians infringe PharmaStem's '427 patent does not determine whether the counterclaims are sufficiently mature. The claims made by CorCell are directly related to the misuse of the '427 patent, as well as PharmaStem's other patents, by threats to enforce them beyond their scope, regardless of whether the patents are valid or infringed by CorCell. This case provides an appropriate forum for litigating the issues that include CorCell's claims.

The counterclaims relate directly to Didier's misrepresentations to obstetricians and customers of CorCell, claims related to those heard on a preliminary basis by the District Court in Delaware, which enjoined PharmaStem and Didier from continuing to disseminate communications similar to those at issue in this case.

Didier's arguments regarding Judge Sleet's Order are inappropriate at this time. CorCell, in this motion to dismiss, is not required to prove that it will prevail on the alleged claims. CorCell must only have plead facts sufficient to support its allegations. Didier's arguments, similar to those of the other counterclaim defendants, are more appropriately made at another time. While Didier argues that perhaps there is some theory of infringement, which neither he nor PharmaStem has yet clearly articulated, that would allow a means to avoid the unmistakable and clear holdings of Judge Sleet on any claim of indirect infringement of PharmaStem's patents, CorCell has adequately alleged that Didier's threats to physicians to impose infringement liability simply by virtue of the collection of cord blood are utterly meritless and not asserted in good faith. Didier's attempts to denigrate the significance of Judge Sleet's orders, both on July 2, 2004 and on September 15, 2004, cannot undercut the sufficiency of CorCell's pleading to overcome a motion to dismiss.

Didier's baseless threats to enforce PharmaStem's patents against physicians who collect cord blood for CorCell's customers, make CorCell's Counterclaims ripe for consideration by this Court.

C. **CorCell Has Sufficiently Plead Facts To Support Each Of Its Claims Against Didier, And, Therefore, Survive A Motion To Dismiss**

Similar to the other counterclaim defendants, Didier has improperly attempted to argue the merits of CorCell's counterclaims. In determine the propriety of granting a motion to dismiss, the court must "determine whether, under any reasonable reading of the pleadings, the [counterclaim] plaintiffs may be entitled to relief, and [the court] must accept as true the factual allegations in the complaint and all reasonable inferences therefrom." *Nami v. H. Fauver*, 82 F. 3d 63, 65 (3rd Cir. 1996). "The complaint will be deemed to have alleged sufficient facts if it adequately put the [counterclaim] defendants on notice of the essential elements of the

[counterclaim] plaintiff's cause of action." *Id.* *Accord Eagle's Eye, Inc. v. Ambler Fashion Shop, Inc.* 627 F. Supp. 856 (E. D. Pa. 1985). *See Del Monte Fresh Produce Co. v. Dole Food Co., Inc.*, 136 F. Supp. 2d 1271, 1283 (S.D. Fla. 2001) ("The threshold of sufficiency that a complaint must meet to survive a motion to dismiss is exceedingly low.") *See also Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). "In considering a Rule 12(b)(6) motion, [the court does] not inquire whether the [counterclaim] plaintiff will ultimately prevail, only whether the claimant is entitled to offer evidence to support the claims." *Nami*, 82 F. 3d at 65. *See also In re K-Dur Antitrust Litigation*, No. 01-1652, 2004 U.S. Dist. LEXIS 19804, *25 (D. N. J. September 29, 2004) ("The issue is not whether the plaintiff will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claims."). Each of CorCell's Counterclaims meets this threshold.

CorCell has alleged that Didier has made false and misleading statements to the effect that CorCell's services infringe PharmaStem's patents and that physicians infringe those patents simply by collecting umbilical cord blood. CorCell has pleaded that there has been actual deception as well as a tendency to deceive a substantial portion of the intended audience, i.e., obstetricians and consumers, and CorCell has plainly pleaded that the deception is material in that it is likely to, and has, influenced purchasing decisions. Didier's only answer is to claim that his statements are privileged, true or lay opinions, and, therefore, are non-actionable.

Didier ignores the allegations of bad faith contained in CorCell's counterclaims. Simply because none of the cases recently brought by PharmaStem have been resolved by final judgment, Didier argues that his statement of PharmaStem's position cannot be false. To the contrary, where Didier could not possibly have a good faith belief in the position he articulates, his statements cannot be protected and can be the subject of liability. Didier has not merely

stated his position on a possible future event, but rather has made statements on the present state of legal liability, and false statements at that. The facts as plead demonstrate that Didier and PharmaStem's statements, already found to be false and misleading by a federal court, were meant to dissuade third parties from using the services of CorCell in violation of state and federal laws. *See e.g., Vogue Ring Creations, Inc. v. Hardman*, 410 F.Supp. 609 (D.R.I. 1976). Further, the cases relied upon by Didier in this portion of his argument are summary judgment cases, *e.g., Golan v. Pingel Enterprise, Inc.*, 310 F.3d 1360, 1370-71 (Fed. Cir. 2002); *Zenith Elecs. Corp v. Exzec, Inc.*, 182 F.3d 1340, 1353 (Fed. Cir. 1999), not cases decided under Rule 12(b)(6), and thus are entirely inapposite. To the extent that CorCell's pleading may be deficient in its pleading of bad faith or malice, leave to amend should be granted.

Contrary to Didier's suggestions, this is not a case involving expressions of opinion about the meaning of a statute or regulation, as in *Coastal Abstract Service, Inc. v. First American Title Ins. Co.*, 173 F. 3d 725, 731 (9th Cir., 1999), nor is there a requirement here to anticipate a subsequent interpretation of the law, as in *Dial-A-Car, Inc. v. Transportation, Inc.*, 82 F. 3d 484, 489 (DC Cir., 1996). To the contrary, in this case there has been a clear and unambiguous ruling from the District of Delaware that contributory infringement of the directly analogous PharmaStem patent cannot be found on the basis of providing a service rather than the sale of cord blood. That same principle clearly applies to the potential liability of an obstetrician for contributory infringement under PharmaStem's '427 patent.

The allegations made by CorCell, taken as a whole, and evaluated in accordance with the standard required by a rule 12(b)(6) motion, sufficiently alleges each of CorCell's counterclaims against Didier. CorCell incorporates herein by reference its arguments in its Memorandum of Law in Opposition to Plaintiff's Motion to Dismiss. CorCell's Lanham Act claim is sufficient

because it has alleged that Didier made false statements having the capacity to deceive, which were intended to and have caused harm to CorCell by interfering with its business and causing customers to be unable to perform contracts with CorCell, or unwilling to enter into contracts in the future to purchase CorCell's services. These same allegations satisfy the requirements of CorCell's causes of action under state law for tortious interference and for commercial disparagement and trade libel. Didier clearly understood that CorCell had these existing and prospective business relationships, and specifically sought to interfere with them, and to cause CorCell to suffer a loss of business and good will. To the extent that a more specific pleading is required to allege Didier's lack of privilege, leave to amend should be granted. Therefore, CorCell's claims should not be dismissed.

## CONCLUSION

For all the foregoing reasons, Defendant CorCell respectfully requests that the Court deny Nicholas Didier's Motion to Dismiss.

Respectfully submitted,

James J. Rodgers (Pa. I.D. No. 21635)
Validation Code No.: JR797
Evelyn McConathy (Pa. I.D. No. 68299)
Darryl W. Shorter (Pa. I.D. No. 87554)
DILWORTH PAXSON LLP
3200 Mellon Bank Center
1735 Market Street

Dated: November 15, 2004

Philadelphia, PA 19103
215-575-7000

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of Defendant/Counterclaim Plaintiff Corcell's Memorandum Of Law In Opposition To Counterclaim/Defendant Nicholas Didier's Motion To Dismiss has been served via U.S. Mail in a properly addressed envelope with sufficient postage thereon to affect delivery, addressed to:

> Michael D. LiPuma
> Law Office of Michael LiPuma
> Two Penn Center, Suite 200
> Philadelphia, PA 19102
>
> Larry R. Wood, Jr., Esquire
> PEPPER HAMILTON LLP
> 3000 Two Logan Square
> Eighteenth & Arch Streets
> Philadelphia, PA 19103-2799

Date: November 15, 2004                         Darryl W. Shorter

**Page 1**

```
 1        IN THE UNITED STATES DISTRICT COURT
 2         IN AND FOR THE DISTRICT OF DELAWARE
 3                        - - -
 4  PHARMASTEM THERAPEUTICS,    :   Civil Action
    INC.,                       :
 5                              :
         Plaintiff,             :
 6                              :
         v.                     :
 7                              :
    VIACELL, INC., CRYO-CELL    :
 8  INTERNATIONAL, INC., CORCELL,:
    INC., STEMCYTE, INC., CBR   :
 9  SYSTEMS, INC., f/k/a CORD BLOOD:
    REGISTRY, INC., BIRTHCELLS  :
10  TECHNOLOGY, INC., NUSTEM    :
    TECHNOLOGIES, INC., and     :
11  BIO-CELL, INC.,             :
                                :
12       Defendants.            :   No. 02-148-GMS
13                        - - -
14  VIACELL, INC., CRYO-CELL    :   Civil Action
    INTERNATIONAL, INC. and     :
15  CORCELL, INC.,              :
                                :
16       Plaintiffs,            :
                                :
17       v.                     :
                                :
18  PHARMASTEM THERAPEUTICS,    :
    INC.,                       :
19                              :
         Defendants.            :   No. 04-1335-GMS
20
21                 Wilmington, Delaware
22               Wednesday, November 3, 2004
                        10:00 a.m.
23                        - - -
24  BEFORE:  HONORABLE GREGORY M. SLEET, U.S.D.C.J.
25
```

**Page 2**

```
 1  APPEARANCES:
 2       PHILIP A. ROVNER, ESQ.
         Potter Anderson & Corroon LLP
 3            -and-
         PAUL J. ANDRE, ESQ.
 4       Perkins Coie LLP
         (Menlo Park, California)
 5
                   Counsel for Plaintiff
 6
         JEFFREY L. MOYER, ESQ.
 7       Richards, Layton & Finger
              -and-
 8       PAUL F. WARE, ESQ.,
         JOHN ENGLANDER, ESQ.,
 9       CHRIS HOLDING, ESQ., and
         ELAINE BLAIS, ESQ.
10       Goodwin Procter LLP
         (Boston, MA)
11
                   Counsel for ViaCell
12
         RICHARD D. KIRK, ESQ.
13       Morris, James, Hitchens, & Williams LLP
              -and-
14       WILLIAM F. ABRAMS, ESQ., and
         THOMAS CHAFFIN, ESQ.
15       Pillsbury Winthrop LLP
         (Palo Alto, California)
16
                   Counsel for CBR Systems, Inc.
17                 F/k/a Cord Blood Registry, Inc.
18       JAMES J. RODGERS, ESQ., and
         EVELYN H. McCONATHY, ESQ.
19       Dilworth Paxson LLP
         (Philadelphia, PA)
20
                   Counsel for Defendant CorCell, Inc.
21
22                        - - -
23
24
25
```

**Page 3**

```
 1                    INDEX
 2       Preliminaries --------------------- Page 5
 3       Opening Remarks, Mr. Ware -------- Page 13
 4  WITNESS
 5  NICHOLAS S. DIDIER
 6       Direct examination --------------- Page 16
         Cross-examination ---------------- Page 75
 7       Redirect examination ------------- Page 94
         Recross-examination -------------- Page 101
 8
    SUSAN CHRISTOPHER
 9
         Direct examination --------------- Page 104
10       Cross-examination ---------------- Page 110
         Redirect examination ------------- Page 116
11
         Argument, Mr. Ware --------------- Page 130
12
         Reply, Mr. Andre ----------------- Page 148
13
         Response, Mr. Ware --------------- Page 162
14
    CONTEMPT ARGUMENT
15
         Argument, Mr. Englander ---------- Page 168
16
         Reply, Mr. Andre ----------------- Page 183
17
         Response, Mr. Englander ---------- Page 203
18
    PHARMASTEM'S MOTION
19
         Argument, Mr. Andre -------------- Page 207
20
         Reply, Mr. Englander ------------- Page 233
21
         Mr. Rodgers ---------------------- Page 244
22
         Mr. Abrams ----------------------- Page 245
23
         Reply, Mr. Andre ----------------- Page 246
24
25
```

**Page 4**

```
 1                  EXHIBITS
 2   1, 2, 4, 5
     5A, 5B, 5C,
 3   7, 7A, 13,
     15, 15A, 15B,
 4   15C, 17, 18
     18A, 20, 21             Page 119
 5
     22   Amnesty Agreement Forms      Page 74
 6
     23   Set of Amnesty Agreements    Page 74
 7
     24   Face Page of Mailing List    Page 75
 8
     26   Affidavit of Eric Gould      Page 118
 9
     25   Affidavit of Chris Adams
10                  - - -
```

Page 25

1  Q. Where are the company's documents maintained? Is that
2  at your home in Larchmont?
3  A. That is correct.
4  Q. Did you search those documents for purposes of these
5  proceedings to produce documents to your lawyers?
6  A. That is correct.
7  Q. Do you have any documents whatsoever in Larchmont that
8  were not produced to your lawyers?
9  A. We searched the documents.
10 Q. What does that mean, we searched the documents?
11 A. We went through the documents.
12 Q. Who is we?
13 A. We looked at the documents. I personally looked at the
14 documents, looked at the document requests, started and
15 worked from the list to establish where those documents could
16 be. Some were in electronic format, and I printed out a copy
17 of those documents, and they were delivered to our counsel to
18 be provided to ViaCell.
19 Q. Did you deliver copies of all emails regarding these
20 correspondences, the amnesty agreements, to your counsel for
21 potential production here?
22 A. To the best of my knowledge, we have produced
23 everything we found.
24    Now, this being said, we may have to continue
25 searching and eventually find some more. But to the best of

Page 26

1  my knowledge, we receive about 60, 70 emails per day. Not
2  all of them, I wouldn't even say most of them, not pertaining
3  to PharmaStem. It is our approach to delete emails which are
4  not relevant.
5     We haven't deleted any emails which are relevant
6  to this case somewhere from mid-September on.
7     But in general, we delete emails as they come in
8  and as we take action.
9  Q. The upshot of that is that during the period from the
10 end of the trial in November 2003 to what you have indicated
11 was September 2004, you have deleted hundreds of emails?
12 A. That is correct.
13 Q. And you have no way of knowing at this point whether
14 they are or are not relevant to aspects of the litigation
15 that are now before the Court. Is that right?
16 A. I cannot judge one way or another.
17 Q. In any event, you don't have them?
18 A. That is correct.
19 Q. Were you instructed at any time by counsel to maintain
20 this correspondence because of pending motions, including
21 posttrial motions, the preliminary injunctions?
22 A. I was instructed by counsel to maintain emails after we
23 had received a complaint of ViaCell we got in the antitrust
24 case.
25 Q. But not until well into September 2004. Is that

Page 27

1  correct?
2  A. That is correct.
3  Q. Do you have the correspondence with the mail house as
4  regards the June 1 letter or the August 2 press release or
5  the amnesty agreement letter of August 20?
6  A. If there is correspondence, we have produced it.
7  Q. Now, following the June 1 letter, and specifically with
8  the July 2nd order of the Court, you learned, did you not,
9  that characterizing patent infringement as occurring when
10 only a part of the patented process is practiced, you
11 understood that to be wrong. Isn't that correct?
12 A. I didn't do that to be wrong when I wrote this letter.
13 Q. Following that letter, by July 2nd, you learned that at
14 least a federal judge had said you can't say that practicing
15 a part of an invention is patent infringement. Correct?
16 A. That is correct.
17 Q. And you understood that saying that would be unfair and
18 misleading. Isn't that correct?
19 A. Under that interpretation, that's correct.
20 Q. Well, that's an interpretation you had an interest in,
21 since the Judge had all the posttrial motions pending before
22 him. Isn't that correct?
23 A. Yes.
24 Q. Now, following that order, you sent out the August 20
25 letter, and the attached amnesty agreements, which appear at

Page 28

1  Tab 5. Do you see that?
2  A. Yes.
3  Q. And in that letter, you make additional statements
4  about what constitutes patent infringement. Isn't that so?
5  A. That is correct.
6  Q. You first -- by the way, this is the letter that went
7  to the 25,000 obstetricians. Correct?
8  A. Yes.
9  Q. And you knew, did you not, having done a prior mailing,
10 that a number of those obstetricians to whom you were sending
11 the letter weren't even practicing anymore. Isn't that
12 right?
13 A. If you do have --
14 Q. Stick with me if you will. You knew as of August 20,
15 2004, when you made your second mailing under the list, that
16 a number of the physicians to whom you were mailing it didn't
17 even practice OB/GYN at the time you were doing a mailing.
18 Isn't that correct?
19 A. The same way we did when we did our first mailing, yes.
20 Q. You knew that?
21 A. Of course.
22 Q. And so the mission here was to do a quick and dirty
23 mailing of 25,000 without scrutinizing that list in any
24 detail. Correct?
25 A. There are always changes to a list. People cease

**Page 41**

1 dispute, such as whether there was patent infringement in
2 this case. For the purposes of this hearing today, I think
3 it does not lend itself to an inclusion under 408 of the
4 answer to the question that has been propounded. So I am
5 going to overrule the objection.
6         MR. ANDRE: Thank you, Your Honor.
7 BY MR. WARE:
8 Q. In any event, the terms under which you were prepared
9 to settle with the litigants was on the basis of their
10 agreeing not to collect cord blood. Isn't that correct?
11 A. Not to collect cord blood for unlicensed cord blood
12 banks.
13 Q. Yes. In other words, you were intent at this point on
14 shifting this business, if you could, to the licensed cord
15 blood banks. Correct?
16 A. I would not say shifting the business. All we wanted
17 to do is to enforce our patents and come to an agreement with
18 the obstetricians not to collect for any unlicensed banks and
19 participate in the infringement act.
20 Q. Well, without my trying to characterize your conduct,
21 the effect of the settlement agreement, as you understood it,
22 was that any of these litigants who agreed, these physicians
23 who agreed to the settlement would be promising to collect
24 cord blood only for your licensees. Correct?
25 A. That is correct.

**Page 42**

1 Q. And if they did otherwise, they would be in breach of
2 the agreement. Correct?
3 A. That is correct.
4 Q. And you understood and hoped, in fact, that that would
5 cut down the supply of blood to the four companies which you
6 viewed as renegade in this industry, that is the unlicensed
7 banks. Correct?
8 A. We hoped, and that was the purpose of it, that it would
9 stop infringing acts, yes.
10 Q. In the August 20th letter, going back to 5 for a
11 moment, in the fourth paragraph down, you say in part, quote,
12 It is PharmaStem's position, as asserted in the recent
13 lawsuits, that obstetricians are liable for patent
14 infringement if they collect cord blood..."
15         Is that correct?
16 A. That is correct.
17 Q. So one of the things you were telling the physicians
18 was that it's an infringing act to collect cord blood.
19 Right?
20 A. Yes.
21 Q. Now, you understood following Judge Sleet's July 2nd
22 order that that was exactly the kind of misleading statement
23 that the Court had told you not to make. Isn't that so?
24 A. No.
25 Q. Didn't you understand Judge Sleet's order of July 2 to

**Page 43**

1 say you can't tell people, it is misleading to say that part
2 of a patented process constitutes infringement? Isn't that
3 right?
4 A. Judge Sleet's order says that we are not authorized to
5 make any misleading statements. And we took to heart each
6 time any press release or any communication was made to the
7 broad public or the obstetricians that we would not, under
8 any circumstance, go against the Judge's order.
9         What we say here is we just state the facts,
10 nothing more, nothing less.
11 Q. Well, in effect, Mr. Didier, you got around the July
12 order by adding language that says, "It is PharmaStem's
13 position." Isn't that right?
14 A. It is PharmaStem's position in the lawsuits filed in
15 the Central District.
16 Q. Right. So that's your way of getting around the
17 Court's instruction that you not say part of a patented
18 process is infringing. You simply alter the language to say,
19 In PharmaStem's view. Right?
20 A. It is PharmaStem's view based on the action in the
21 Central District of California. It is not -- you have to
22 look at it in the context. You cannot say that we would have
23 filed this lawsuit in order to circumvent Judge Sleet's
24 order. We didn't do that.
25 Q. I am not suggesting you filed the lawsuits to

**Page 44**

1 circumvent the order. I am suggesting that what you have
2 done here again is tell these physicians that part of the
3 patented process is enough for infringement, namely,
4 collecting cord blood. Right?
5 A. Based on the complaint in the Central District Court,
6 yes.
7 Q. So your view is it was enough to allude to recent
8 lawsuits, and these physicians were somehow supposed to
9 understand that that didn't mean the lawsuit pending in
10 Delaware. It meant the lawsuit in Southern California or
11 Massachusetts, or Florida. Is that right?
12 A. It is right. Can I elaborate?
13 Q. No. Is it the case --
14         THE COURT: You will get a chance to have Mr.
15 Andre ask additional questions.
16         THE WITNESS: Thank you.
17 BY MR. WARE:
18 Q. You knew in sending these letters to physicians that
19 OBs in particular are not sophisticated in the ways of patent
20 law. Isn't that right?
21 A. I wouldn't say that.
22 Q. You would not say that?
23 A. No.
24 Q. You think OB/GYNs spend their time trying to understand
25 patent infringement cases and patents?