**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

PHARMASTEM THERAPEUTICS, INC.,    )
                                     )
         Plaintiff,           )
                                     )
      v.                     )     Civil Action No. 2:04-CV-03561-RK
                                     )
CORCELL, INC., et al.,              )
                                     )
         Defendants.      )

**SUPPLEMENTAL MEMORANDUM OF LAW OF DEFENDANT MOLLY MCBRIDE,
M.D. IN SUPPORT OF MOTION TO DISMISS FOR LACK OF PERSONAL
JURISDICTION**

Defendant Molly McBride, M.D. ("McBride") submits this Supplemental Memorandum

of Law in support of her motion to dismiss for lack of personal jurisdiction.

At the Court's suggestion, plaintiff PharmaStem Therapeutics, Inc. took the deposition of

Dr. McBride on issues related to personal jurisdiction on November 12, 2004. That deposition

conclusively demonstrates that Dr. McBride is not amenable to jurisdiction in the Eastern

District of Pennsylvania, either under principles of general or specific jurisdiction. Indeed,

plaintiff's arguments border on the frivolous.

Dr. McBride's deposition is brief. A copy of the deposition transcript is attached hereto

in its entirety as Exhibit A. The deposition establishes clearly that she has no continuous and

substantial relationship with Pennsylvania, and that she has not conducted any specific activities

related to an act of infringement in or relating to Pennsylvania.

Once a defendant properly raises an issue of personal jurisdiction, the plaintiff has the

burden of presenting evidence, by affidavit or otherwise, to establish facts that support the

exercise of jurisdiction. *Time Share Vacation Club v. Atlantic Resorts, Ltd.*, 735 F.2d 61, 66 n.9

(3d Cir. 1984). ("A Rule 12(b)(2) motion, such as the motion made by the defendants here, is

557743_1

inherently a matter which requires resolution of factual issues outside the pleadings, i.e. whether personal jurisdiction actually lies. Once the defense has been raised, then the plaintiff must sustain its burden of proof in establishing jurisdictional facts through sworn affidavits or other competent evidence.")[1]

This is especially true when plaintiff has had the opportunity to conduct jurisdictional discovery. *Pieczenik v. Dyak Corp.*, 265 F.3d 1329 (Fed. Cir. 2001) ("Under those circumstances, the plaintiffs bore the burden of proving by a preponderance of the evidence the facts necessary to establish personal jurisdiction over the defendant."). *See In re DaimlerChrysler AG Securities Litigation*, 247 F. Supp.2d 579, 582 (D. Del. 2003) ("After limited jurisdictional discovery, the plaintiff may not rest on the allegations of his complaint....").

## I.    There is No Basis for Assertion of General Jurisdiction Over Dr. McBride.

Since Dr. McBride completed her medical education and residency in Pennsylvania in 1998, the focus of her professional career, and her residence, have been in Delaware. While Dr. McBride was employed in a Delaware-based practice from 1998 until March, 2001, she did spend approximately 20% of her time in an office in West Grove, PA. McBride Deposition at 10-11. However, Dr. McBride left that practice in March, 2001, and is no longer licensed to practice medicine in Pennsylvania. McBride Deposition at 25.

The mere fact that the Delaware corporation in which Dr. McBride now practices medicine has some patients who travel into Delaware from their Pennsylvania residences to

---

[1] Plaintiff's reliance on *Pinker v. Roche Holdings, Inc.*, 292 F.3d 361 (3d Cir. 2002) cannot change this burden, or justify plaintiff's insistence that this Court accept any fanciful statement by plaintiff for purposes of this motion. The burden on plaintiff to provide evidence supporting the exercise of jurisdiction is clearly established in *Time Share* and many cases following it. To the extent that language in *Pinker* may be read as inconsistent with *Time Share*, it must be disregarded as it is a subsequent panel opinion that may not contradict or change the precedent of an earlier panel opinion that has not been overruled *en banc*.

receive medical care in Delaware does not establish that Dr. McBride has regular, substantial contacts with Pennsylvania, such that it can be said that she has invoked the protection of Pennsylvania's laws for her personal activities.

Plaintiff's representation of Dr. McBride's testimony on this point is a gross distortion; the testimony does not support the proffered inference that she has 2,000 patients from Pennsylvania. Of course, even if she did, that would not establish a basis for exercise of jurisdiction over her by this Court. Indeed, this would be precisely the kind of "random," "fortuitous" or "attenuated" contacts that the Supreme Court noted in *Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985) as being insufficient to establish general jurisdiction.

Plaintiff's reliance on *AMP Inc. v. Methode Electronics Inc.*, 823 F. Supp. 259 (M.D. Pa. 1993) is unavailing. In that case, Judge McClure found general jurisdiction based on the fact that the defendant placed its goods into the stream of interstate commerce, with many of its products finding their way into Pennsylvania as a result of the activities of distributors and agents who regularly come into Pennsylvania for the purpose of making such sales. Significantly, the court in *AMP* found no specific jurisdiction in a patent infringement case, where plaintiff argued that defendant "marketed" the infringing product in Pennsylvania.

The fundamental facts, as established in the deposition, are that Dr. McBride lives and works exclusively in Delaware. As of the filing of suit in 2004, she had no continuous and systematic contacts with Pennsylvania, and thus cannot be subject to general jurisdiction here. Indeed, the exercise of general jurisdiction requires "significantly more than minimum contacts." *Provident Nat'l Bank v. California Federal Sav. & L. Ass'n.*, 819 F.2d 434, 437 (3d Cir. 1987). *See Snyder v. Dolphin Encounters, Ltd.*, 235 F. Supp. 2d 433, 437 (E.D. Pa. 2002) ("The Court

of Appeals for the Third Circuit requires a very high showing before a court may exercise general jurisdiction.").

**II.     Plaintiff Can Point to no Conduct by Dr. McBride Tied to an Act of Infringement in Pennsylvania.**

In order to assert jurisdiction under the rubric of specific jurisdiction, the plaintiff must show that the cause of action asserted arises from the defendant's forum-related activities. *Mellon Bank (East) v. DiVeronica Bros.,* 983 F.2d 551 (3d Cir. 1993); *see Burger King*, 471 U.S. at 475.   The claim asserted in this case against Dr. McBride is that she has infringed PharmaStem's U.S. Patent No. 6,569,427 ("the '427 patent").   The claims of the patent require multiple steps relating to the processing and use of cord blood.

The only specific conduct alleged in the complaint by Dr. McBride is that she collected cord blood which was ultimately stored by CorCell.  Complaint ¶ 11.  This conduct alone would not infringe any claim of the '427 patent, and plaintiff does not so contend.   The complaint alleges generally that Dr. McBride has "infringe[d], contributorily infringe[d] and or induce[d] the infringement of the '427 patent by making, using selling and/or offering to sell the methods claimed in the '427 patent."  Complaint ¶ 18.  The complaint provides no further specificity.  Dr. McBride's deposition plainly refutes any suggestion that she has done anything other than collect cord blood at the request of some of her patients, and it is clear from her deposition that she has not collected cord blood in Pennsylvania.  McBride Deposition at 52-53.

Clearly, plaintiff believed that it had to show infringing conduct by each defendant in this district as a predicate to the exercise of personal jurisdiction, as it alleged that "[p]ersonal jurisdiction over defendants...McBride...is appropriate because, on information and belief, they have and continue to infringe, contributorily infringe and/or induce infringement of the asserted patents in this district."  Complaint ¶ 6.  Dr. McBride's deposition clearly demonstrates that she

has done nothing of the kind in this district. Even assuming that her actions cited by plaintiff in its Supplemental Brief could constitute infringing behavior, they have occurred entirely within Delaware, and predated both the issue of the '427 patent and her awareness of it.

The '427 patent, the sole patent asserted against Dr. McBride, did not issue until May 27, 2003. Accordingly, any basis for specific jurisdiction over a claim of infringement must relate to conduct after May 27, 2003. Clearly, conduct predating the issue of the patent could not induce its infringement. It is clear, moreover, from her deposition, that Dr. McBride has never directly infringed the '427 patent, and plaintiff apparently does not allege that she has, for purposes of this motion. Similarly, she cannot be liable for contributory infringement because she has never sold cord blood, or offered it for sale. Dr. McBride was not even aware of the patent until after she was sued in this action. McBride Deposition at 56. To the extent that plaintiff is relying on a theory of inducement of infringement, Dr. McBride's conduct could not induce infringement of a patent of which she was not aware.

Plaintiff cites Dr. McBride's testimony to establish that she has discussed CorCell with perhaps 20 of her patients, and that she has collected cord blood for perhaps 50 patients. However, plaintiff again fails to tie these bare facts to any alleged infringement. Indeed, it is clear from the deposition that Dr. McBride discusses cord blood collection with patients only when the patients initiate the conversation. McBride Deposition at 28-32. CorCell is discussed only when raised by the patient, and she cannot say that she has discussed CorCell with a patient since May, 2003. *Id.*

The fact that Dr. McBride provided a testimonial used on the CorCell website is of no significance to a determination of jurisdiction in this case, even if under some circumstances such an act could expose her to liability for infringement. First of all, her conduct with respect to

the testimonial took place in Delaware.  Based on her deposition, it appears that she gave the testimonial before the '427 patent issued, as it was about the time of her daughter's birth in February, 2003. McBride Deposition at 43-48.  Clearly, Dr. McBride did not knowingly induce anyone in Pennsylvania to infringe the '427 patent.

PharmaStem's argument that Dr. McBride received "financial compensation" in the form of a complementary processing and storage of her daughter's cord blood is also of no significance.  Plaintiff has not related this fact to any act of infringement.   The deposition does not support a conclusion that this was compensation for any services provided by Dr. McBride to CorCell, and it is a complementary service made available to all OB/GYNs. McBride Deposition at 40-41.  While it is true that Dr. McBride's practice now bills patients $100 for the service of collecting cord blood, there is no evidence tying that payment in any way to CorCell.   Thus, there is no basis for any suggestion that Dr. McBride was compensated for recommending CorCell's services.   Indeed, she testified directly that her practice has received not financial compensation from CorCell. McBride Deposition at 40-41.

The fact that representatives of CorCell have visited Dr. McBride in Delaware, plus the mere fact that her office (and not she individually) has distributed to patients in Delaware brochures advertising CorCell's services, and that Dr. McBride may have discussed CorCell in the course of conversation with a handful of patients about cord blood collection, certainly cannot provide a basis for the exercise of specific jurisdiction in Pennsylvania with respect to plaintiff's claim of infringement of the '427 patent.

The fundamental flaw in plaintiff's theory of specific jurisdiction is its inability (indeed, its lack of even an attempt) to tie the cited conduct to an act of infringement of the '427 patent in Pennsylvania.

## CONCLUSION

Dr. McBride's deposition forcefully demonstrates that there is no basis for forcing her to defend charges of infringement of PharmaStem's '427 patent in Pennsylvania. She lives and works in Delaware, and has practiced exclusively there for more than two years prior to the date on which the patent issued. Any incidental contact with Pennsylvania patients, and the possibility that she has collected the cord blood of a Pennsylvania resident in Delaware, cannot establish her purposeful availment of the protections of the Commonwealth of Pennsylvania sufficient to subject her to personal jurisdiction in this Court. PharmaStem's jurisdictional allegation is utterly baseless, and its arguments, in light of Dr. McBride's deposition testimony, border on the frivolous. The complaint should be dismissed as to Dr. McBride for lack of personal jurisdiction.

Respectfully submitted,

James J. Rodgers (PA ID No. 21635; JR797)
Darryl W. Shorter (PA ID No. 87554)
Dawn N. Zubrick (PA ID No. 90732)
DILWORTH PAXSON LLP
3200 Mellon Bank Center
1735 Market Street
Philadelphia, PA 19103
(215) 575-7000
Attorneys for Defendants

Dated: December 15, 2004

## CERTIFICATE OF SERVICE

I hereby certify that on December 15, 2004, a true and correct copy of the foregoing Supplemental Memorandum of Defendant Molly McBride, M.D. in Support of her Motion to Dismiss for Lack of Persona Jurisdiction was served by first class mail on the following counsel of record:

Michael D. LiPuma, Esq.
Two Penn Center
Suite 200
Philadelphia, PA 19103

Paul J. Andre, Esquire
Perkins Coie, LLP
101 Jefferson Drive
Menlo Park, CA 94025

_____ JR797
James J. Rodgers (PA Id. No. 21635)

557743_1

# EXHIBIT A

# CONDENSED TRANSCRIPT

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

PHARMASTEM THERAPEUTICS, INC.,
A Delaware Corporation,
    Plaintiff

    V                    NO. 2:04-CV-03561-RK

CORCELL, INC., a Delaware
Corporation, MOLLY McBRIDE, M.D., an
individual, and CARLO M. CROCE, M.D.,
an individual,
    Defendants

CORCELL, INC., a Delaware
Corporation,
    Counterclaim-Plaintiff,

    V

PHARMASTEM THERAPEUTICS, INC.,
NICHOLAS DIDIER and STEMBANC, INC.,
    Counterclaim-Defendants

         Oral deposition of MOLLY
McBRIDE, M.D., taken at the law
offices of Wolf Block, Wilmington
Trust Center, 1100 North Market
Street, Suite 1001, Wilmington,
Delaware, on Friday, November 12,
2004, commencing at approximately
9:29 a.m., before Barbara McKeon
Quinn, a Registered Merit Reporter
and Notary Public, pursuant to
notice.



**James DeCrescenzo Reporting, LLC**
INNOVATING LITIGATION
1880 JFK Blvd., 6th Floor • Philadelphia, PA 19103
www.jdreporting.com

215.564.3905
PHONE

215.751.0581
FAX

2 (Pages 2 to 5)

ORAL DEPOSITION OF MOLLY MCBRIDE, M.D. - 11-12-04

### 2

```
 1    APPEARANCES:
 2    MICHAEL D. LIPUMA, ESQUIRE
         mlipuma@lipumalaw.com
 3    LAW OFFICE OF MICHAEL LIPUMA
         Two Penn Center Plaza
 4       Suite 200
         Philadelphia, Pennsylvania 19102
 5       215-664-6446
         Counsel for Plaintiff
 6
      JAMES J. RODGERS, ESQUIRE
 7    DILWORTH PAXSON, LLP
         3200 Mellon Center
 8       1735 Market Street
         32nd Floor
 9       Philadelphia, Pennsylvania 19103
         215-575-7000
10       Counsel for Defendants
11
12           EXAMINATION INDEX
13
      MOLLY MCBRIDE, M.D.
14       BY MR. LIPUMA . . . . .   4
         BY MR. RODGERS . . . . .  56
15
16
17
18
19
20
21
22
23
24
```

### 3

```
 1          EXHIBIT INDEX
 2             MARKED
      Exhibit
 3    M-1 Mid-Atlantic Health Plan      13
          provider list of ob/gyn
 4        physicians in
          Pennsylvania
 5
      M-2 Website information for       21
 6        the group All About Women
 7    M-3 Web page from CorCell         37
          website
 8
      M-4 Web pages from the            48
 9        CorCell website including
          Testimonials from Doctors
10
      M-5 Declaration of Molly          51
11        McBride, M.D.
12    M-6 Web pages on CorCell's        53
          website regarding CorCell
13        Referral Program
14
15
16
17
18
19
20
21
22
23
24
```

### 4

```
 1            MOLLY McBRIDE, M.D., having
 2    been duly sworn, was examined and
 3    testified as follows:
 4            THE COURT REPORTER:  Usual
 5    stipulations?
 6            MR. RODGERS:  Yes.
 7            MR. LiPUMA:  Everything
 8    except for form and privilege to
 9    trial.
10            EXAMINATION
11    BY MR. LiPUMA:
12        Q.   For the record, my name is
13    Mike LiPuma.  I know I introduced
14    myself off the record.  I represent
15    Pharmastem Therapeutics, Inc. in a
16    lawsuit pending in the United States
17    District Court for the Eastern
18    District of Pennsylvania against
19    CorCell, you and Dr. Carlo Croce.
20            You understand that we're
21    here today to take your deposition on
22    the issue of whether you're subject
23    to the jurisdiction of the court up
24    in Pennsylvania.  Do you understand
```

### 5

```
 1    that?
 2        A.   I understand that.  I don't
 3    clearly understand what it all means.
 4        Q.   I'll leave that between you
 5    and your attorney.  Also, the
 6    deposition is limited to 90 minutes
 7    by court order.  If you need a break
 8    at any time, just let me know.
 9        A.   All right.
10        Q.   Let me go over a few
11    preliminary instructions.  The first
12    is, if I ask a question and you don't
13    understand it, please let me know and
14    I'll do my best to rephrase it.
15        A.   Okay.
16        Q.   Because if I ask it and you
17    answer it, I'll assume that you
18    understood it.  Do you understand
19    that instruction?
20        A.   Correct.
21        Q.   The second one and you're
22    doing it already is, please be sure
23    to give a verbal answer to my
24    questions.  The court reporter can't
```

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905     Innovating Litigation          FAX  215.751.0581
              1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
                         www.JDReporting.com

ORAL DEPOSITION OF MOLLY MCBRIDE, M.D. - 11-12-04

### 6

1　take down a nod of the head or an
2　uh-huh or something like that.  So
3　please be sure to give a verbal
4　answer.  Do you understand that?
5　　A.　Yes.
6　　Q.　The final one is, and I'll
7　try to comply with this as well is
8　please be sure to let me finish my
9　question before you begin your
10　answer, and I'll extend the same
11　courtesy to you.  Again, it will just
12　make it easier for the court
13　reporter.
14　　A.　Fine.
15　　Q.　Do you understand that?
16　　A.　Yes.
17　　Q.　Dr. McBride, have you ever
18　had your deposition taken before?
19　　A.　Yes.
20　　Q.　How many times?
21　　A.　Once.
22　　Q.　When was that?
23　　A.　Few months ago.
24　　Q.　What was the case about?

### 7

1　　A.　A malpractice case.
2　　Q.　Where was that case
3　pending?
4　　A.　It's pending in Delaware.
5　　　No, actually it's not.
6　It's pending in Chester County.
7　Sorry.
8　　Q.　Chester County,
9　Pennsylvania?
10　　A.　Correct.
11　　Q.　Are you a defendant in that
12　case?
13　　A.　Yes.
14　　Q.　Who else is a defendant in
15　that case?
16　　A.　No one.
17　　Q.　Does the case arise out of
18　a time when you were working at the
19　Christiana practice in West Grove,
20　Pennsylvania?
21　　A.　Yes.
22　　Q.　What's the name of the
23　plaintiff in that case?
24　　A.　Stephanie Thornton.

### 8

1　　Q.　What is your residential
2　address?
3　　A.　2603 West 16th Street,
4　Wilmington, Delaware 19806.
5　　Q.　Do you own any real estate
6　in Pennsylvania?
7　　A.　No.
8　　Q.　Do you lease any real
9　estate in Pennsylvania?
10　　A.　No.
11　　Q.　Where do you have your
12　driver's license?
13　　A.　Delaware.
14　　Q.　Did you have a Pennsylvania
15　driver's license at one point?
16　　A.　No.  I don't think I -- I
17　don't recall ever having a
18　Pennsylvania driver's license even
19　when living in Pennsylvania.
20　　Q.　Have you ever voted in
21　Pennsylvania?
22　　A.　No.
23　　Q.　Do you currently vote in
24　Delaware?

### 9

1　　A.　Yes.
2　　Q.　Have you ever paid
3　Pennsylvania state income taxes?
4　　A.　Yes.  When I was a
5　resident, a medical resident.
6　　Q.　So when was the last time
7　you paid Pennsylvania state income
8　taxes?
9　　A.　1998.
10　　Q.　I want to talk a little bit
11　about your educational background.
12　Where did you receive your
13　undergraduate degree?
14　　A.　Penn State University.
15　　Q.　What year?
16　　A.　1987.
17　　Q.　How about your medical
18　degree?
19　　A.　Medical College of
20　Pennsylvania in 1994.
21　　Q.　After you received your
22　medical degree, where did you do your
23　residency?
24　　A.　University of Pennsylvania.

**James DeCrescenzo Reporting**, LLC
Innovating Litigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                    FAX  215.751.0581

ORAL DEPOSITION OF MOLLY MCBRIDE, M.D. - 11-12-04

10

1    Q. And in what years were you
2 at the University of Pennsylvania
3 doing residency?
4    A. '94 to '98.
5    Q. Where did you live during
6 that time?
7    A. Variety of places in center
8 city Philadelphia.
9    Q. After you completed your
10 residency, where did you first work?
11    A. Christiana Ob/Gyn.
12    Q. And you were an
13 obstetrician and gynecologist?
14    A. Correct.
15    Q. Where was Christiana Ob/Gyn
16 located?
17    A. There was an office in
18 Newark and an office in West Grove,
19 Pennsylvania.
20    Q. And by Newark you mean
21 Newark, Delaware?
22    A. Newark, Delaware. Sorry.
23    Q. Which office did you work
24 in or did you work in both?

11

1    A. Both. Primarily Newark,
2 Delaware. The West Grove office was
3 sort of a smaller outpost.
4    Q. Can you estimate for me how
5 much time you spent in each office?
6    A. 80 percent in Newark; 20
7 percent in West Grove.
8    Q. You started there in 1998?
9    A. Correct.
10    Q. When did you stop working
11 there?
12    A. In March of 2001.
13    Q. How many physicians were
14 part of the Christiana practice?
15    A. Three.
16    Q. What hospital or hospitals
17 were you affiliated with during the
18 time you worked at the Christiana
19 practice?
20    A. Christiana Hospital in
21 Delaware, and at the time the
22 hospital out there was called
23 Southern Chester County. I think
24 it's changed hands a few times. I

12

1 did GYN only out of Southern Chester
2 County, no obstetrics.
3    Q. Chester County, Delaware?
4    A. Southern Chester County,
5 Pennsylvania.
6    Q. I just want to be sure I
7 understand. Christiana Hospital was
8 in Christiana, Delaware?
9    A. Correct.
10    Q. You also had privileges at
11 Southern Chester County --
12    A. Hospital.
13    Q. -- Hospital and your
14 practice there was limited solely to
15 GYN?
16    A. Correct.
17    Q. And this is --
18    A. I think it's now -- I'm
19 sorry. I think it's now called
20 Jennersville Hospital.
21    Q. What you just described is
22 consistent for the whole time 1998 to
23 March of 2001 that you worked at
24 Christiana practice?

13

1    A. Correct.
2    Q. During the time that you
3 worked at the Christiana practice,
4 where did you live?
5    A. In the same location.
6    Q. Meaning center city
7 Philadelphia?
8    A. No. 26 -- same location I
9 live now.
10    Q. So once you started
11 practicing at Christiana --
12    A. I moved here.
13    Q. -- that's when you moved to
14 Wilmington?
15    A. Yes.
16    MR. LiPUMA: Let's go ahead
17 and mark this Exhibit-1, please.
18    (Exhibit M-1 was marked for
19 identification.)
20 BY MR. LiPUMA:
21    Q. Dr. McBride, I'm showing
22 you what's been marked as M-1. Have
23 you ever seen this document before?
24    A. No.

**JDR**
**James DeCrescenzo Reporting, LLC**
Innovating Litigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905        FAX 215.751.0581

5 (Pages 14 to 17)

ORAL DEPOSITION OF MOLLY MCBRIDE, M.D. - 11-12-04

---

14

1    Q.  My understanding is that
2  it's a provider list from
3  Mid-Atlantic Health Plan and that's
4  your name which appears on the second
5  page; is that correct?
6    A.  Yes.
7    Q.  Was that the address for
8  the West Grove office which appears
9  there under your name?
10    A.  Correct.
11    Q.  And you were an approved
12  provider for the Mid-Atlantic Health
13  Plan during the time that you
14  practiced in the Christiana ob/gyn
15  practice?
16    A.  Yes.
17    Q.  Is it fair to say that most
18  of the patients you saw in the West
19  Grove office were Pennsylvania
20  residents?
21    A.  Yes.
22    Q.  Were any of the patients
23  you saw in the Christiana office
24  Pennsylvania residents?

---

15

1    A.  Yes.
2    Q.  Where did you start working
3  after March of 2001?
4    A.  I started my own practice.
5    Q.  Where was that located?
6    A.  Newark, Delaware.
7    Q.  Did you operate it under
8  your own name?
9    A.  No.  There's a group of us.
10    Q.  What is it called?
11    A.  All About Women.
12    Q.  Can you describe the nature
13  of the practice for me.
14    A.  It's a full service
15  obstetrics and gynecology practice.
16  There are five principals.
17    Q.  Five physicians?
18    A.  Correct.
19    Q.  When did you all begin that
20  practice?
21    A.  My two partners began a few
22  months before I did in January of
23  2001.  I entered in April of 2001.
24    Q.  How many days do you see

---

16

1  patients in All About Women?
2    A.  I see patients three days
3  in the office, one day in the
4  hospital.
5    Q.  Have you been working at
6  All About Women since April 2001?
7    A.  Yes.
8    Q.  How is All About Women
9  organized from a corporate
10  standpoint?  Is it a corporation, an
11  LLC, a partnership, something else?
12  If you know.
13    A.  I don't know.
14    Q.  You have an ownership
15  interest in it, though?
16    A.  Yeah.  I think it's PA.
17  PA.
18    Q.  If you don't know, that's
19  okay.
20    A.  I don't know.
21    Q.  But you're not just an
22  employee.
23    A.  No.
24    Q.  You're an owner.

---

17

1    A.  Yes.
2    Q.  Correct?
3    A.  Correct.
4    Q.  Thank you.
5    A.  Don't know all the business
6  details.
7    Q.  May I ask how it's
8  organized in terms of the patients.
9  You have patients that only you see
10  or a patient that you see one of your
11  colleagues may also see?
12    A.  It's a group practice.  So
13  even patients under my name,
14  particularly obstetrical patients,
15  are seen by the group because they
16  may be delivered by anyone in the
17  group.  So essentially all patients
18  are shared.
19    Q.  Does All About Women have
20  any patients who are Pennsylvania
21  residents?
22    A.  Yes.
23    Q.  Can you estimate for me the
24  percentage of All About Women's

---

**JDR**

**James DeCrescenzo Reporting**, LLC
Innovating Litigation
1880 JFK Blvd., 6ᵗʰ Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                      FAX  215.751.0581

ORAL DEPOSITION OF MOLLY MCBRIDE, M.D. - 11-12-04

18

1 patients who are Pennsylvania
2 residents?
3    A.  It would be a strict
4 estimate.  I really couldn't tell
5 you.
6    Q.  Just an estimate.
7    A.  Ten percent.
8    Q.  Can you estimate for me how
9 many patients overall All About Women
10 has?
11    A.  20,000.
12    Q.  For its Pennsylvania
13 patients, does All About Women accept
14 insurance from insurance companies
15 based in Pennsylvania?
16    A.  I have no idea.  I don't
17 deal with the insurance situation in
18 the least.
19    Q.  Does All About Women accept
20 Keystone insurance?  Do you know
21 that?
22    A.  I think so.
23    Q.  How about Independence Blue
24 Cross?  Let me ask you some of the

19

1 specific ones.  Do you know whether
2 it accepts an insurance plan called
3 Personal Choice?
4    A.  I have no idea.  I don't
5 deal with the insurance really in the
6 least.  We have a department that
7 deals with that.  People don't get
8 through the front door unless their
9 insurance is approved way before they
10 even get to me.  Basically, I take
11 care of patients.
12    Q.  Does All About Women do any
13 advertising?
14    A.  Not too much.  We have
15 20,000 patients.  We don't really
16 need any more.
17    Q.  When you say "Not too
18 much," does it do any advertising?
19    A.  We did when we first opened
20 our doors.  We advertised in the
21 Wilmington News Journal and in
22 Delaware Today.
23    Q.  What is Delaware Today?
24    A.  It's a local magazine.

20

1    Q.  Has All About Women ever
2 done any advertising in Pennsylvania?
3    A.  Initially, when I -- when
4 we started the practice, there were
5 notices in some of the local papers
6 in southern Chester County, because
7 that was the only way I could let my
8 patients know that I moved.  I was
9 not allowed to tell them that I had
10 left the practice.  So it was a way
11 to notify my patients in the area
12 that I had moved.
13    Q.  So were notices placed in
14 newspapers in southern Chester
15 County?
16    A.  Local newspapers in
17 southern Chester County.
18    Q.  Would this have been around
19 the spring of 2001?
20    A.  Correct.
21    Q.  How about since spring of
22 2001?  Has All About Women done any
23 advertising in Pennsylvania?
24    A.  I don't know.  Not to my

21

1 knowledge.  I don't think we've
2 advertised there for some time.  But
3 I could be wrong.
4    MR. LiPUMA:  Let's go ahead
5 and mark this as M-2, please.
6    (Exhibit M-2 was marked for
7 identification.)
8 BY MR. LiPUMA:
9    Q.  Dr. McBride, I'm showing
10 you what's been marked as Exhibit
11 M-2.  Can you identify this for me?
12    A.  It looks like a bio on
13 doctors.
14    Q.  And this is from the web
15 site of All About Women?
16    A.  Yes.
17    Q.  Did you have any
18 involvement in putting together the
19 web site?
20    A.  None.
21    Q.  Your bio appears among
22 these pages that are part of M-2; is
23 that correct?
24    A.  Correct.

**JDR**
**James DeCrescenzo Reporting,** LLC

215.564.3905          Innovating Litigation          FAX  215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

7 (Pages 22 to 25)

ORAL DEPOSITION OF MOLLY MCBRIDE, M.D. - 11-12-04

22

1    Q.  Does All About Women have
2  any brochures that it gives out to
3  patients or prospective patients
4  about the All About Women practice?
5    A.  Yes.
6    Q.  And what is the point of
7  transmittal of those brochures?  I
8  mean they at the office, or do
9  you go somewhere else and give them
10  out to prospective patients?
11    A.  They're sitting in a big
12  bulletin board of other information
13  for patients.  Information about
14  different kinds of diseases and
15  things, questions, things they may
16  have questions about.  They sometimes
17  have questions about our background,
18  so those are there if they want to
19  take one.
20    Q.  And the bulletin board is
21  in your office?
22    A.  Yes.
23    Q.  What's the address of the
24  All About Women office?

23

1    A.  620 Stanton Christiana
2  Road, Newark, Delaware.
3    Q.  Is that the only location
4  for the All About Women practice?
5    A.  Yes.
6    Q.  What hospitals is All About
7  Women affiliated with?
8    A.  Christiana Hospital only.
9    Q.  That's located in
10  Christiana, Delaware?
11    A.  Yes.
12    Q.  Going back to the
13  brochures, are brochures ever mailed
14  to patients or prospective patients?
15    A.  I don't know.  I don't know
16  if a brochure is mailed out with
17  initial patient information.  When
18  patients schedule as a new patient
19  visit, they're sent directions and
20  information to fill out ahead of time
21  to save time when they get there
22  about their medical background.  I'm
23  not sure if a brochure is included.
24  Perhaps.

24

1    Q.  Has All About Women ever
2  done any radio advertising?
3    A.  Not to my knowledge.  Could
4  be.  Really I'm not aware.  We have
5  an advertising department.  We have a
6  person who handles that.
7    Q.  Any television advertising
8  that you're aware of?
9    A.  No.
10    Q.  Have you done any teaching
11  since April 2001 when you joined All
12  About Women?
13    A.  Yes.
14    Q.  What type of teaching have
15  you done?
16    A.  Teach residents and medical
17  students at Christiana Hospital.
18    Q.  Have you done any teaching
19  in Pennsylvania since April of 2001?
20    A.  No.
21    Q.  Have you given any lectures
22  in Pennsylvania since April of 2001?
23    A.  No.
24    Q.  What states do you

25

1  currently maintain a license to
2  practice medicine in?
3    A.  Delaware.
4    Q.  Did you have a Pennsylvania
5  license at one time?
6    A.  Yes.
7    Q.  For how long did you have
8  your Pennsylvania license?
9    A.  I don't remember exactly.
10  I don't know the years, and I don't
11  think you renew them every year.  So
12  after I left Christiana Ob/Gyn and
13  started All About Women, I let my
14  Pennsylvania license go.  I don't
15  know at what point that exactly
16  occurred.
17    Q.  Have you practiced medicine
18  in Pennsylvania at all since you
19  joined All About Women in April of
20  2001?
21    A.  No.
22    Q.  Do you retain privileges at
23  any Pennsylvania hospitals?
24    A.  No.

**JDR**
**James DeCrescenzo Reporting**, LLC
Innovating Litigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com
215.564.3905                                    FAX  215.751.0581

ORAL DEPOSITION OF MOLLY MCBRIDE, M.D. - 11-12-04

26

1    Q.  Have you since April of
2  2001?
3    A.  No.
4    Q.  I want to now start talking
5  about the collection of cord blood,
6  Dr. McBride.  When did you first
7  collect cord blood?
8    A.  I don't recall.
9    Q.  Was it while you were at
10  the West Grove practice?
11    A.  I don't recall ever
12  collecting cord blood at the West
13  Grove practice.  It's recent.  I
14  can't say that for sure, but I don't,
15  I don't recall it being common
16  practice there.
17    Q.  Did anyone who was involved
18  in that Christiana practice, which
19  had an office in West Grove, do any
20  cord blood collection --
21    A.  I don't know.
22    Q.  -- during the time that you
23  were there?
24    A.  I don't know.

27

1    Q.  How many times have you
2  collected cord blood?
3    A.  I couldn't tell you the
4  answer to that question.
5    Q.  Ballpark.  Like 5?  50?
6  500?
7    A.  50.
8    Q.  That's an estimate?
9    A.  Estimate.
10    Q.  And you believe, but you're
11  not sure, you never did it at West
12  Grove, meaning that you would have
13  not done it before April 2001?
14    A.  Not that I recall but, once
15  again, that's a recollection only.
16    Q.  Cord blood is collected by
17  a physician by means of a kit; is
18  that correct?
19    A.  Correct.
20    Q.  What does the kit consist
21  of?
22    A.  It depends on the company.
23  There are a variety of kits and a
24  variety of companies.

28

1    Q.  Who provides the kit?
2    A.  The patient.
3    Q.  Are there particular
4  circumstances under which you discuss
5  the possibility of cord blood
6  collection with a patient?
7    A.  If asked by a patient.
8    Q.  Are there any other
9  circumstances in which you would do
10  that?
11    A.  No.
12    Q.  And if a patient asks you
13  about cord blood collection, what do
14  you tell them?
15    A.  I really leave it in their
16  hands.  They -- I tell them do your
17  research; if you choose to do it, you
18  need to choose your company.  You can
19  research them on the Internet.  It's
20  still not something that's sanctioned
21  by the American College of Obstetrics
22  and Gynecology, so I cannot recommend
23  it to everyone.
24    Q.  Do you offer patients the

29

1  names of companies who are involved
2  in cord blood collection?
3    A.  Not particularly.
4    Q.  When you say "Not
5  particularly," do you never
6  mention --
7    A.  Specific names?
8    Q.  -- specific names?
9    A.  There are brochures in the
10  office left by sales representatives
11  from a variety of companies.  Those
12  brochures are placed in a bag that's
13  given to the patients on their first
14  prenatal visit, and if they ask about
15  specific companies, really the only
16  information I give them in my
17  experience with ease of collection
18  with a variety.
19    Q.  Which companies' brochures
20  appear in this bag that are given to
21  the patients?
22    A.  I have no idea which ones
23  are left by which reps at what time.
24  One month to the next could be

9 (Pages 30 to 33)

ORAL DEPOSITION OF MOLLY MCBRIDE, M.D. - 11-12-04

30

1 different. Whoever's been in the
2 office that month and left them.
3   Q. How about CorCell? Are
4 their brochures included in the bags?
5   A. Sometimes. Sometimes not.
6 I don't put the bag together, so I
7 don't know what's in it at any given
8 month.
9   Q. You said you'll sometimes
10 give the patient your recommendation
11 about ease of collection in terms of
12 the different companies.
13   A. Uh-huh.
14   Q. What recommendation do you
15 give them?
16   A. There's one company in
17 general that I specifically mention
18 that I have a difficult time using
19 their collection system. So it's not
20 my personal favorite to use because I
21 don't feel I always get an adequate
22 volume. There's a specific volume,
23 recommended volume limit. I have
24 trouble personally, as do my

31

1 partners, using one specific
2 company's collection system.
3   Q. Is that company CorCell?
4   A. No.
5   Q. Have you ever discussed
6 CorCell with a patient?
7   A. Yes.
8   Q. How many patients have you
9 discussed it with?
10   A. 20.
11   Q. What have you told the
12 patients about CorCell?
13   A. It's easy to collect.
14   Q. Is it your opinion that
15 it's the easiest of all the companies
16 that you've dealt with to collect?
17   A. Easiest, no.
18   Q. One of the easiest?
19   A. Yes. There are others with
20 similar collection systems that are
21 equally as easy.
22   Q. Do you remember the first
23 time you discussed CorCell with a
24 patient?

32

1   A. No.
2   Q. Do you remember the most
3 recent time you discussed CorCell
4 with a patient?
5   A. No.
6   Q. Has it been since May of
7 2003?
8   A. I don't know.
9   Q. Maybe, maybe not?
10   A. Maybe, maybe not.
11   Q. Were any of the patients
12 with whom you discussed CorCell
13 Pennsylvania residents?
14   A. I don't know.
15   Q. Of the approximately 50
16 patients for whom you've collected
17 cord blood, were any of them
18 Pennsylvania residents?
19   A. I don't know. I don't
20 recall.
21   Q. You don't recall one way or
22 the other?
23   A. Uh-uh.
24   Q. Just so I'm clear, though,

33

1 from time to time CorCell's brochures
2 have been included in the bags, which
3 are given to your patients?
4   A. Correct. I think. I mean,
5 I think they have been. That's the
6 only way patients would have brought
7 up CorCell to us if they had —
8 although sometimes patients come in,
9 they've already done research on
10 their own from magazines and
11 Internet.
12   Q. So they know already what
13 provider they want to use?
14   A. Usually.
15   Q. Are there any instances in
16 which you yourself obtain the kit to
17 be used for the patient?
18   A. No. Never.
19   Q. It's always the patient who
20 provides the kit to you?
21   A. Correct.
22   Q. Have you ever met with any
23 salespeople from CorCell?
24   A. Yes.

**JDR**

**James DeCrescenzo Reporting**, LLC
Innovating Litigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                          FAX  215.751.0581

ORAL DEPOSITION OF MOLLY MCBRIDE, M.D. - 11-12-04

34

1  Q. How many meetings have you
2  had with CorCell salespeople?
3  A. Two.
4  Q. When was the first time?
5  A. I have no idea.
6  Q. When was the most recent
7  time?
8  A. It's been a long time.
9  Q. Who are the salespeople
10 that you met with during the first
11 meeting?
12 A. I don't know.
13 Q. How about during the second
14 meeting?
15 A. Don't know.
16 Q. Where did the meetings take
17 place?
18 A. They brought us lunch.
19 Q. To the office in
20 Christiana?
21 A. Yes.
22 Q. Did you meet with them
23 individually or was anyone else from
24 your practice involved in those

36

1  anyone from CorCell while you were
2  working in West Grove, Pennsylvania?
3  A. Not that I recall. I don't
4  remember cord blood collection being
5  very commonplace then; it's fairly
6  new.
7  Q. At what hospitals have you
8  done cord blood collection?
9  A. Only Christiana Hospital.
10 Q. Do you charge the patient
11 for cord blood collection?
12 A. Yes.
13 Q. What do you charge the
14 patient?
15 A. A hundred dollars. And not
16 initially. That's only been recently
17 that our billing person discovered we
18 could.
19 Q. When you say recently, how
20 recently?
21 A. Within the last year.
22 Q. Have you charged any
23 patients for cord blood collection
24 when those patients were using

35

1  meetings?
2  A. It's generally a group
3  meeting.
4  Q. What were the purposes of
5  these meetings?
6  A. To inform us about their
7  company.
8  Q. What did they tell you?
9  A. I don't remember.
10 Q. They were trying to
11 persuade you to use their products --
12 A. Correct.
13 Q. -- services?
14 A. Sales reps.
15 Q. Did they give you any
16 promotional information during these
17 meetings?
18 A. I'm sure they left
19 brochures.
20 Q. Anything else?
21 A. Not that I recall. A lot
22 of companies come and do similar
23 things.
24 Q. Did you ever meet with

37

1  CorCell for the storage and
2  processing?
3  A. Probably.
4  Q. Do you know how patients
5  pay the $100? Do they pay it
6  personally? Is it reimbursed by
7  insurance? Is it something else?
8  A. I have no idea.
9  Q. Do you know whether it's
10 something which is reimbursable by
11 insurance or not?
12 A. I don't know that.
13 Q. Have you ever gone on to
14 CorCell's web site?
15 A. No.
16 MR. LiPUMA: Let's go ahead
17 and mark this as M-3, please.
18 (Exhibit M-3 was marked for
19 identification.)
20 BY MR. LiPUMA:
21 Q. Dr. McBride, I'm showing
22 you what's been marked as Exhibit
23 M-3, which is a web page from the
24 CorCell web site. Have you ever seen

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905

Innovating Litigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

FAX  215.751.0581

11 (Pages 38 to 41)

ORAL DEPOSITION OF MOLLY MCBRIDE, M.D. - 11-12-04

38

1 this before?
2     A. No.
3     Q. Did you ever have any
4 discussions with anyone about the
5 insurance companies with which
6 CorCell is affiliated?
7     A. No.
8     Q. Were you aware that CorCell
9 was affiliated with any of the
10 insurance companies that are listed
11 on this web page?
12     A. No.
13     Q. You weren't aware one way
14 or the other?
15     A. No.
16     Q. Are you aware of any
17 referral program which CorCell has?
18     A. No.
19     Q. So you're not aware that if
20 one CorCell patient refers another
21 patient to CorCell, they'll receive
22 some sort of financial compensation
23 or other compensation?
24     A. Not aware of that.

40

1 collection. I hand it off.
2 Occasionally, I have to sign
3 something.
4     Q. Have you ever had any
5 involvement after you've passed it
6 off to the nurse?
7     A. No.
8     Q. Have you ever received any
9 financial compensation from CorCell?
10     A. They -- the only
11 compensation I received is that they
12 gave me complimentary -- my initial
13 collection and storage with my
14 daughter was complimentary, which I
15 understand they do for any ob/gyn.
16     Q. Do you know what the cost
17 would have been otherwise for the
18 processing and storage of your
19 daughter's cord blood?
20     A. No. It's somewhere in the
21 range of $1,300 perhaps, is what most
22 of them are.
23     Q. Do you know whether CorCell
24 has ever paid any financial

39

1     Q. After you've collected cord
2 blood, how is it then shipped to
3 whatever company is going to be doing
4 the processing and storaging?
5     A. The patient takes care of
6 that.
7     Q. Have you ever shipped cord
8 blood?
9     A. My husband shipped my own
10 child's cord blood.
11     Q. But you yourself have never
12 shipped cord blood?
13     A. For a patient?
14     Q. Yes.
15     A. Never.
16     Q. If you could walk me
17 through after you've collected the
18 cord blood with the kit what happens
19 next.
20     A. I hand it to the nurse.
21 The nurse and the patient fill out
22 all of the paperwork and take care of
23 whatever else needs to be done. I
24 have no involvement after

41

1 compensation to All About Women
2 meaning the practice or any of your
3 colleagues?
4     A. Absolutely not.
5     Q. Has it offered the
6 complimentary service for the
7 children of any of your colleagues or
8 employees?
9     A. Has it offered that to
10 others?
11     Q. Yes.
12     A. I don't know. Perhaps.
13 Others have been pregnant. They may
14 have had the same. I don't know,
15 though.
16     Q. Do you know where your
17 husband shipped your child's cord
18 blood to?
19     A. I don't. I was kind of
20 busy.
21     Q. Is it only your one
22 daughter that you've used this
23 particular service?
24     A. Correct.

**JDR**

**James DeCrescenzo Reporting**, LLC
Innovating Litigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX 215.751.0581

ORAL DEPOSITION OF MOLLY MCBRIDE, M.D. - 11-12-04

42

1    Q.  Do you know how the
2    financial arrangement works as
3    between your patients who use CorCell
4    and CorCell?
5    A.  No idea.
6    Q.  So you don't know how
7    CorCell charges them, whether
8    insurance covers the payment, nothing
9    along those lines?
10   A.  No.
11   Q.  Have you ever visited
12   CorCell's office in Philadelphia?
13   A.  No.
14   Q.  Have you ever spoken by
15   telephone with anyone in CorCell's
16   office in Philadelphia?
17   A.  Yes.
18   Q.  With whom have you spoken?
19   A.  The president called me to
20   tell me I was being sued.
21   Q.  Any other telephone
22   conversations with anyone at
23   CorCell's office in Philadelphia?
24   A.  No.

43

1    Q.  Have you ever spoken with
2    any of the salespeople in
3    Philadelphia?
4    A.  Yes.  I don't know if
5    they're from Philadelphia.
6    Q.  You've spoken by telephone
7    with some salespeople of CorCell?
8    A.  Maybe.
9    Q.  In what context would have
10   you had these conversations?
11   A.  Surrounding my daughter's
12   filling out paperwork for my
13   daughter's cord blood.
14   Q.  Any other conversations
15   you've had with salespeople of
16   CorCell?
17   A.  No.
18   Q.  Any other communications
19   you've had with anyone at CorCell,
20   salesperson, president, other than
21   your attorneys?
22   A.  The sales rep who asked if
23   it would be okay if I did a
24   testimonial for their web site.

44

1    Q.  Who asked you that?
2    A.  A sales rep.
3    Q.  Do you recall the sale
4    rep's name?
5    A.  No.
6    Q.  Do you recall when you were
7    asked to provide a testimonial for
8    their web site?
9    A.  Soon after the delivery of
10   my child.
11   Q.  Which was when?
12   A.  February of 2003.
13   Q.  Do you recall how soon
14   after you were asked to give the
15   testimonial?
16   A.  I don't recall.
17   Q.  How did the salesperson
18   contact you?  In person, by
19   telephone, by e-mail, some other way?
20   A.  In person.  They were there
21   with a lunch.
22   Q.  So sometime after February
23   2003, a salesperson from CorCell was
24   at your office with a lunch and asked

45

1    you to provide a testimonial?
2    A.  I can't say the exact time
3    frame.  I don't remember actually if
4    it was when I was pregnant or if it
5    was after.  So I can't say that I
6    recall for sure the time frame.
7    Q.  What did the salesperson
8    say specifically, to the best of your
9    recollection?
10   A.  When I came in to lunch and
11   saw that it was CorCell there, I
12   said, oh, that's an easy one.  It's
13   an easy one to do.  I like your
14   collection system.  And he said would
15   you be willing to say that; can we
16   print that on a web site?  Silly me
17   said sure.
18   Q.  What happened next in terms
19   of providing the testimonial?
20   A.  I think I just had to write
21   something down to that effect and
22   then gave it to them.  I don't really
23   recall.
24   Q.  Did you write it right

JDR
James DeCrescenzo Reporting, LLC
Innovating Litigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                          FAX  215.751.0581

13 (Pages 46 to 49)

ORAL DEPOSITION OF MOLLY MCBRIDE, M.D. - 11-12-04

46

1 there at this meeting?
2    A. I don't recall.
3    Q. Did you write it on paper
4 or in an e-mail or by letter?
5    A. I probably wrote it on a --
6 I think there was a form that I
7 signed, that I wrote it and then
8 signed it. I don't, I don't really
9 remember.
10    Q. Who gave you the form?
11    A. The sales rep.
12    Q. Did the sales rep give you
13 the form at your office?
14    A. Yes.
15    Q. Did you mail it to
16 Philadelphia?
17    A. I don't remember. It
18 wasn't a big thing in my life. I
19 didn't give it much thought one way
20 or the other.
21    Q. Did you have to sign
22 anything authorizing CorCell to post
23 your testimonial on their web site?
24    A. Probably, but I don't

47

1 recall that specifically.
2    Q. Do you recall any of the
3 circumstances under which you would
4 have had to sign something like that?
5    A. I don't.
6    Q. Did CorCell pay you for
7 providing the testimonial?
8    A. No.
9    Q. Did they offer to pay you?
10    A. No.
11    Q. Did you ask for any
12 payment?
13    A. No.
14    Q. Again, I'll ask you again,
15 whether you recall whether you were
16 asked to provide the testimonial
17 before or after you used CorCell to
18 collect cord blood for your daughter?
19    A. I don't recall which came
20 first. I think it was after -- my
21 recollection is it was after I used
22 it personally. And I just remember
23 having the conversation with the rep
24 saying the process was easy from a

48

1 patient standpoint, that they had an
2 easy process.
3       MR. LiPUMA: Can you repeat
4 the last part of that answer for me,
5 please.
6       (The court reporter read
7 back the following:
8       "A. And I just remember
9 having the conversation with the rep
10 saying the process was easy from a
11 patient standpoint, that they had an
12 easy process.")
13 BY MR. LiPUMA:
14    Q. Meaning you told the rep
15 that you thought CorCell had an easy
16 process?
17    A. Correct. That's what makes
18 me think it was probably after the
19 birth.
20       MR. LiPUMA: Let's go ahead
21 and mark this as M-4, please.
22       (Exhibit M-4 was marked for
23 identification.)
24 BY MR. LiPUMA:

49

1    Q. Dr. McBride, I'm showing
2 you what's been marked as Exhibit
3 M-4, which is a couple of web pages
4 from the CorCell web site. If you
5 could look at the top, the first
6 paragraph appears to be the
7 testimonial which you gave to
8 CorCell. Is that accurate?
9    A. Correct.
10    Q. Does this refresh your
11 recollection at all as to the
12 circumstances under which you gave
13 the testimonial to CorCell?
14    A. Yes.
15    Q. And having had your
16 recollection refreshed, what do you
17 remember now?
18    A. No more really than what
19 I've said, but this is as I've stated
20 accurate.
21    Q. What other companies' kits
22 have you used to collect cord blood?
23    A. Lifebank, Viacord, Cryo-
24 Cell are ones that I can recall. But



**JDR**

**James DeCrescenzo Reporting**, LLC
Innovating Litigation
1880 JFK Blvd., 6ᵗʰ Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                    FAX  215.751.0581

14 (Pages 50 to 53)

ORAL DEPOSITION OF MOLLY MCBRIDE, M.D. - 11-12-04

50

1 as I say, the patients are the ones
2 responsible for bringing them. So
3 sometimes they're ones that are
4 provided by the patients. I don't —
5 I might never have heard of them.
6 There may be others I've used.
7    Q. After providing this
8 testimonial, which appears on M-4,
9 did you have any further discussions
10 with anyone at CorCell about it up
11 until the time of this lawsuit?
12    A. No.
13    Q. Did the salesman or anyone
14 else call you and ask you to make any
15 revisions to it?
16    A. No.
17    Q. Were any revisions made to
18 the original testimonial which you
19 provided?
20    A. Not to my knowledge. I
21 don't recall.
22    Q. Did you ever have any
23 discussions with a Beth Ludwin at
24 CorCell?

51

1    A. I don't recall that name.
2    Q. How about Dr. Carlo Croce?
3 Have you ever had any discussions
4 with him at CorCell?
5    A. No.
6    MR. LiPUMA: Let's go ahead
7 and mark this as Exhibit M-5, please.
8    (Exhibit M-5 was marked for
9 identification.)
10 BY MR. LiPUMA:
11    Q. Dr. McBride, I'm showing
12 you what's been marked as Exhibit
13 M-5. Can you identify this document
14 for me?
15    A. How would you like me to
16 identify it?
17    Q. Well, let me try and then
18 you can tell me whether I've done it
19 accurately. This is a declaration
20 you provided as part of the lawsuit
21 up in Philadelphia; is that correct?
22    A. Sure. Correct.
23    Q. If you could take a look at
24 the first paragraph. It states you

52

1 have practiced medicine exclusively
2 in the State of Delaware for
3 approximately four and a half years.
4 Do you see that?
5    A. Yes.
6    Q. That's not accurate; isn't
7 that right?
8    A. That's not accurate.
9    Q. It's more like three and a
10 half years?
11    A. Three and a half.
12    Q. I'd like to take a look at
13 paragraph four, which you say you've
14 not collected umbilical cord blood
15 within the State of Pennsylvania at
16 any time since May 27, 2003.
17    I just want to confirm.
18 You don't recall one way or the other
19 whether you've ever collected cord
20 blood in Pennsylvania?
21    A. I don't recall ever
22 collecting cord blood in
23 Pennsylvania but --
24    Q. But?

53

1    A. I don't know that for
2 sure. I can't say that for sure.
3 Certainly not since April of 2001
4 when I -- well, no. Let me take that
5 back.
6    I've never collected cord
7 blood in the State of Pennsylvania,
8 because I've never done a delivery
9 for a private patient in the State of
10 Pennsylvania.
11    So while I was with
12 Christiana Ob/Gyn, there may have
13 been Pennsylvania residents who
14 delivered in Delaware who had cord
15 blood collection, but I did not do
16 any deliveries in Pennsylvania since
17 I left residency.
18    MR. LiPUMA: Let's mark
19 this as Exhibit M-6, please.
20    (Exhibit M-6 was marked for
21 identification.)
22 BY MR. LiPUMA:
23    Q. Dr. McBride, I'm showing
24 you what's been marked as Exhibit

**JDR**

**James DeCrescenzo Reporting**, LLC

Innovating Litigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                    FAX  215.751.0581

15 (Pages 54 to 56)

ORAL DEPOSITION OF MOLLY MCBRIDE, M.D. - 11-12-04

54

1  M-6, which are some additional pages
2  from CorCell's web site regarding its
3  referral program. Have you ever seen
4  these before?
5      A. No.
6      Q. Were you aware or have you
7  ever been aware that CorCell has a
8  referral program?
9      A. I can't say that I really
10  paid much attention to it.
11     Q. Have any of your patients
12  ever spoken with you about it?
13     A. Not that I recall.
14     Q. If you look at the second
15  page and if you could read that,
16  please.
17     A. "If you are a --"
18     Q. You don't have to read it
19  out loud. You're welcome to take as
20  much time as you like to read it to
21  yourself.
22     A. Okay.
23     Q. Would you agree with me
24  that this states that if you're a

55

1  CorCell blood bank customer and you
2  refer a friend to CorCell, and they
3  save their blood through CorCell,
4  that CorCell will send the person
5  $25? Do you see how it says that?
6      A. Yes.
7      Q. Were you aware of that
8  particular program?
9      A. No.
10     Q. Have any of your patients
11  ever discussed it with you?
12     A. No.
13     Q. And again, you've never
14  received any financial compensation
15  from CorCell other than the
16  complimentary service for your
17  daughter?
18     A. Correct.
19        MR. LiPUMA: Why don't we
20  take a break.
21     (RECESS)
22  BY MR. LiPUMA:
23     Q. I just have a couple more
24  questions, Dr. McBride. Have you

56

1  ever taken any continuing medical
2  education classes in cord blood
3  collection?
4      A. No.
5        MR. LiPUMA: That's all I
6  have.
7        MR. RODGERS: I have a
8  couple questions.
9        EXAMINATION
10  BY MR. RODGERS:
11     Q. Doctor, when did you first
12  hear of Pharmastem Therapeutics?
13     A. When they sued me.
14     Q. When was the first time you
15  heard that there were any patents
16  relating to cord blood?
17     A. When I received the
18  lawsuit.
19        MR. RODGERS: That's all I
20  have.
21     (Testimony closed at
22  10:18 a.m.)
23
24

**JDR**

**James DeCrescenzo Reporting**, LLC

Innovating Litigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                    FAX  215.751.0581